Case number 14-1101 at L. Healthbridge Management, LLC at L v. National Labor Relations Board. Ms. Murphy for the petitioners, Mr. Cantor for the respondents. Good morning, Your Honors, and may it please the Court, Erin Murphy on behalf of the petitioners would like to reserve two minutes of rebuttal time. It's long been settled law that health care facilities presumptively have the right to prohibit their employees from wearing insignia in patient care areas in order to protect their patients from potential disruption or disturbance. The question in this case is whether health care facilities forfeit that right by deciding to assess the disruptiveness of insignia on a case-by-case rather than categorical basis. We submit that the answer to that question must be no. There's no sound basis for inferring from the decision not to prohibit all insignia that every decision to prohibit some insignia or even a single item is presumptively motivated by anti-union bias rather than genuine patient care concerns. And there's certainly no basis for drawing that kind of inference in a case like this one where it's undisputed that these facilities routinely permitted employees to wear union-related insignia and objected only when they found one particular item particularly disruptive, disturbing, and misleading. Haven't you waived this argument? I don't think we have, Your Honor. We accepted specifically to the findings and the legal conclusions with respect to insignia in patient care areas below. We repeatedly discussed in our... Where did you accept to the St. John's policy? Our exception itself doesn't specifically reference that, but in our briefs we talk repeatedly about how at the time of our actions they were presumptively legal and that the rule changed in the interim and that the Board adopted a new presumption. And this did seem to put the Board itself on notice that we were making this argument because the Board specifically addressed and reaffirmed its presumption over a dissent that said we don't think that this presumption of invalidity should apply in this area. Where did you argue in your briefs that if the rule changed in the interim that that rule changed or that policy change was wrong? We did not specifically put the argument in those terms, but the government hasn't pointed to any cases, and I haven't come across any that require that kind of specificity as a 10E jurisdictional question. The cases instead generally turn on if you're trying to raise an entirely new issue. So, for instance, if we had only accepted to the Bulletin Board issue below, and now we're here trying to accept to the sticker issue, that's the kind of issue that raises a 10E concern. The cases I've seen from this Court don't really talk about that you can't shift the basis for your ultimate argument. And here our ultimate argument really is just the same one we made below, which is there's not substantial evidence to support this finding, and the problem with the finding is that it's based on an inference that should not be drawn. It's based on a presumption that isn't supported by the facts that were actually adduced, which is the requirement of what presumptions must be. They must rest on a sound connection between the facts that were adduced and the facts that the Board seeks to infer from those. So, ultimately, whether you want to think about it as a question of whether the presumption here is a valid one or just as a question of simply whether there was substantial evidence in this record, I think you get to the same result, and I think you get to the same result if you think about it, too, as a special circumstances question. Because all of those just point to the same problem, which is that rather than produce actual evidence that called into question the uncontroverted testimony here, that these stickers were indeed likely to be disruptive in a way that... The testimony was from a lawyer and from an expert, and the expert hadn't spoken to any patients and didn't connect her opinion to past experience with any similar types of stickers, right? Well, I would dispute the second part of that. I mean, she testified about her experience working as a nurse on the floor for decades, working as a nursing care administrator, and basing it on the judgment calls that she made in that role. And the whole point of that expert testimony is that if you do have a concern about Ms. Crutchfield and want to question whether her judgment was reasonable, the expert witness is there to say, I'm an independent expert who looked at this and came to the conclusion that the judgment reached by Ms. Crutchfield was a reasonable one. Now, if the Board wants to question that, it's entitled to put on its own expert witness who provides a different opinion, to put on other hospital administrators who say, this is crazy, nobody would ever make this conclusion. It didn't. It put on absolutely no evidence. It just dismissed out of hand our evidence. And when you look at its reasons for doing... What, if anything, did the expert say to distinguish these stickers from the letters that HealthBridge sent out? What was discussed about the distinction between the letters and the stickers, and she was never actually presented with the letters. The Board just gave her on cross-examination this hypothetical question of, if there were letters that told people they might lose their care, would that be troubling? She said, yes. But when you look at the actual letters that were given to residents here, they say precisely the opposite. They detail at length, we are providing you with this letter because we want to assure you that whatever happens with the ongoing labor strike, it is not going to impact your care. And that's precisely the concern about these stickers. It's clear to them that these people are likely to strike and that they do that type of thing, right? Yes, and again, our objection to the stickers is not that we don't believe residents should ever be able to learn of ongoing labor strike or unfair labor practices. It's just about the messaging. These stickers said, busted for violating the law, and there was nothing. All that did is raise the concern of, am I going to be able to continue to raise care here? Whereas the letters, yes, they raise that concern, but then they answer that concern by reassuring patients, we have in place a plan to make sure that if there is a strike, it's not going to disrupt your care. But under our deferential standard of review, wouldn't it be reasonable for a board to say, we can't really give this expert testimony much weight because the expert's distinction between the stickers and the letters doesn't really hold much water, and therefore, you know, the company's position here can't really be sustained. I mean, isn't that a rational conclusion that a board can make? I don't think it is. I would say two things. First of all, I don't think that it's a rational conclusion to say that there's no difference between presenting the problem of disruption and presenting it with the answer of, don't worry, it won't disturb you. But beyond that, I would also point you to the Supreme Court. The sticker that says, busted? Yes, it says, busted for violating the law, without reassuring patients, elderly, Alzheimer's patients, this isn't going to get in the way of your care, or their family members, that this isn't going to get in the way of their care. But I would also point you to the Supreme Court. The strike isn't going to get in the way of their care? Excuse me? They wouldn't be concerned that a strike might get in the way of their care? Which is precisely why the letters go on to say, no, you may know that a strike might happen, and we want to reassure you it won't get in the way of your care. But I would like to point you to the Supreme Court's language in the Baptist Hospital case. And there, the court specifically admonished the board that it can't just ignore uncontroverted testimony from health care providers about what is and is not likely to disrupt patients when there isn't actually evidence that points in the other direction. Ms. Murphy, you make a lot in your briefing of the notion that the board's rule restricts more speech than your approach would. But can you address more? I mean, there are real dangers of the selective ban, and that's why the board adopted a presumption against. And it seems like some of these interpretive questions about what did the busted sticker communicate and how disruptive was it, it's precisely that kind of inquiry that the board thought is difficult to do post hoc, and that allowing selective bans was really to invite suppression of employee expression. And I'm just not sure you've accounted for that in your opposition to the presumption against selective bans. Well, sure, let me give you two responses to that. I mean, I think there are ready ways for the board to identify evidence that suggests that there's something pretextual and speech-related going on instead of trying to target real concerns about patient care. One is, is it a selective ban that's applied across the board to the union? I mean, that's obviously problematic, and we're not here defending the notion that if the board had a presumption that said, if you allow everything but union-related insignia, you know, that then you're going to have a problem. Another way is, in the St. John's case, there was evidence there. You know, it wasn't just that they'd prohibited, they'd permitted other insignia in the past. The hospital had distributed a button that had almost the identical message that was on the button that was then distributed by the union. And in that circumstance, it was quite easy to say, well, wait a second, you thought it was okay, and put it out there for employees to, you know, for residents to see, and now you're objecting just because the union wants to do the same thing? That was similar in this court's decision in the Stanford case. That's another case where the court looked at the fact that the hospital had put up its own anti-union flyers in the same place and then objected when the board, or when the union wanted to have union-related solicitation. So there's ready tools for the board to identify when there are circumstances that suggest that something else is going on. But all we're saying is the mere fact that you prohibited one thing instead of everything isn't in and of itself good enough to infer bias. What are HealthBridge's objective criteria for selecting what's disruptive and what's not? So what was discussed in the testimony below was the combination of the wording that was used and the images used with it. But that's kind of post-hoc, you know. If you were to articulate what their approach is, you know, is there anything in the record that says how do they make those determinations other than in reaction? Well, you know, for one thing, it's by nature kind of an impressionistic inquiry when you're looking at insignia to determine what it's likely to do. For another thing, to the extent that there's not a lot of practice developed in this area, it's because up until about a year and a half ago, every health care facility thought that it had a presumption of validity in this area. So we weren't aware that we needed to develop some sort of, you know, legal criterion that we were going to need to defend in court to defend judgments that a particular insignia was more disruptive than others. But the things that were looked at here was the use of the word busted along with a judge's gavel and the clear message of this center has violated the law. That is what they believed distinguished this item from anything else that had been permitted in the past because none of the other items here. Of course, a resident might react negatively to you supporting a presidential candidate, different from the one they prefer, or not like the fact that there's strife between the employer and the employee. But there's something fundamentally different about insignia that bears the message of your center violated the law. That's going to point into residents' minds, concerns about what does that mean? What does that mean for my care? What is going to happen at this center in light of the fact that it violated the law? So that is precisely what Ms. Crustfield testified gave her concern here, and it's precisely what Dr. Warner-Marone testified gave her concern when she distinguished this from the other stickers and insignia that was presented to her and was asked, you know, do you think these are equally troubling? I don't know that you have to go that far as far as, I mean, it is a, here's a sticker the size of it. I mean, if that were on the chest of a nurse who is feeding me, I'm 90 years old, and I see my health care facility, Danbury Health Care Center, has been busted for a violation of the federal labor law, that's far different from the St. John's which said RNs for safe patient care and St. John's for safe patient care. What I mean by you don't have to go that far is in Baptist, their expert testimony, who I think was one of the hospital administrators, said, we have found that any time we do anything that lets a patient or their family see that we have our mind on anything but patient care, and to me, that's what this did. I mean, this nurse is supposed to be taking care of this patient, and what does she have, a huge button that says busted. I mean, it seems to me that she has her mind on something else, and Baptist goes on to say the board, even though it's the one that creates these presumptions and we defer to it, it should constantly be revising those presumptions and its orders in recognition of the not only sui generis nature of hospitals and patient care, and particularly nursing homes where the patients are completely helpless, that they have to, in recognition of that characteristic, and the characteristic being so susceptible to disruption or fear or whatever it is they're trying to do in managing these patients. We couldn't agree more with everything you just said, and I think that the thing that's fundamentally important to recall here is this is a case about patient care areas. It's not a case about other parts of health care facilities. It's about where the patients get cared for and what they're going to see, and that is why there has always been a different role in patient care areas than there is in areas where patients are unlikely to be present. And that argument, though, doesn't apply to the flyers. Well, the flyers issue is limited to the lounges. There's no question about those not being seen by patients. On the stickers, you said we had no reason to think that there was any presumption against selective bans until recently. I guess I have two aspects of that question. What about Mom Clemens, which really didn't articulate it fully that way, but it reasoned against selective bans or presumptively against them? And also, is there anything showing that there was, in fact, reliance by HealthBridge? Anything that you can point to? I can't recall whether there was testimony specifically about the presumption itself. There was testimony that Ms. Crutchfield consulted with outside counsel before she made the decision, so presumably in consulting with outside counsel, the point of that was to, you know, she did in the email, I believe, reference that it was their understanding that this was consistent with law. So there's evidence that they were taking into account what they understood the law to be. In this instance, but not sort of previously or in general? This is the only incident that we're aware of where anybody, where the facilities actually tried to restrict the wearing of insignia in patient care areas. So I don't think it would. But it would also come into play in developing your policies and your approach in bargaining to whether you wanted to say, you know, we're going to have a complete ban because we're worried about these patients. And as you say, it's an impressionistic inquiry. And so rather than put yourselves in that position, you know, a lot of health care facilities do have a fuller ban. You know, and I think a lot more will have complete bans if the rule is going to be that if you have anything less, you're probably going to violate the law, which is exactly why, you know, I think it's not only bad policy for health care facilities, but it doesn't seem to be good labor law policy to say that you're going to treat these as selective bans as presumptively illegal when you may just have health care facilities that are really trying to say our facility is a little bit different than a traditional hospital or for whatever reason we think we can take a different approach here. If they're told that they'll lose all of their discretion by doing that, they're just not going to take another approach. I do want to just address the other part of your question. I think that the best reading when you look at the Mount Clemens cases, at least in the proceedings below, what was going on was overcoming the presumption. And, yes, the presumption was deemed overcome based on some things that are somewhat similar, you know, arguments that aren't totally different than the ones made here, but the insignia in that case was very different than the insignia in this case. And some of the things that were said ultimately when the Court of Appeals went the way of the Union on that decision I don't think are consistent with this Court's case law because they do suggest that you need actual evidence of disruption and all of that, which this Court has said that's not right. But as to the question of whether it was clear that Mount Clemens had reversed the presumption, it doesn't say anywhere in that decision that it's reversed the presumption. The best reading of it is simply it announces at the beginning that there's a presumption and then decides that it has been overcome under the specific circumstances of that case. Your answer to Judge Pillard about the objective criteria, you said it's sort of or basically impressionistic. I don't know how it could be anything other than that because when you take the topic of pornography and you've tried for years to define what it is and you almost do have to wait until you see it. And it's not, you can't even quite define it by content because some of it is the visual, the images that are with it, the way in which. So it really does have to turn on the collective looking at all of this. And as you suggested earlier, there just is a common sense element to all of this. I don't think it's that hard to look at these stickers and understand that they might be concerning to an elderly, cognitively impaired patient. I have one more question about the facts. And that is the board, I think the board majority makes an issue out of there was no evidence that residents or family members complained. These were only worn for what, six hours, right? Yeah, it's unclear to what extent they were worn. It's nothing like, you know, there's a few cases where something was worn for six months with no complaint. Here, they were barely worn at all. And there's no testimony even about the question of whether there were complaints or not. It just simply wasn't addressed because they were basically not worn for any meaningful period of time. The busted sticker says, just so that the record is clear, busted by National Labor Board for violating federal labor law. That's right. You made an argument earlier that there would be lots of potential patient concerns about their health and safety or is there, you know, some other type of violations where they would be shut down or something like that. How do you get to that? I don't really. Any more from this sticker than you would from what the letter said by health. You get there from the reality that patients aren't legal experts who understand that a violation of labor law, you know, the differences between the implications for a violation of labor law versus other forms of law. They have no idea what kind of violation of labor law it is, how extreme it is, and what the consequences may be and what that violation is going to have in terms of an effect on the people who are giving their care on a regular basis. So I think it's an awful lot to expect these patients to look at that and understand, oh, well, this is the kind of legal violation that isn't really a big deal legal violation. Why would a person think that a violation of labor law means? I mean, why, I mean, you're making an argument that being told that there's a violation of labor law is going to raise the specter of all kinds of parades of horrors while at the same time saying that, well, you know, a two- or three-page letter that talks about a potential strike, et cetera, isn't going to raise the same types of parades of horrors? Once again, we don't dispute that informing patients that there might be a strike is going to raise concerns. Our only contention is that's why the letters are different because they go on. They don't end with there might be a strike, sincerely, the centers. You know, they say there might be a strike, and in light of that, we want to assure you that the strike is not going to impact your care. We've been working with agencies to make sure that we continue to comply with all our obligations to ensure that we can get other people in here to do the job if the striking workers aren't able to do it. That's just fundamentally different from raising the prospect of disturbance without answering the question. But, Ms. Murphy, there is a way in which the more you distinguish those two communications, the more content-based your line sounds. And I do think that's at the core of what otherwise seems sort of counterintuitive, this idea that you have to either allow, you know, much speech, much employee expression, except if you really can show with some concreteness that it's going to be disruptive, or not allow any. And so the concern is really that when you're in the driver's seat deciding, you know, what's disruptive and what's not, on the one hand, of course, you have your expertise as providers of health care. On the other hand, you have your interests as an employer. If it's fine for employees to say, hey, I belong to a union, but as soon as they say, and my union thinks this employer is treating me unfairly, it's like, oh, actually, you can't say that. But that's the thing. I don't think we went that far, because, I mean, this is why, you know, the example I give you is the difference between the Grinch sticker and this sticker. And the Grinch sticker says, you know, that health bridges the Grinch who stole Christmas and whatever. And, you know, that's clearly saying we think we're being treated unfairly. That's different from saying your center violated the law. And if you view that as a content-based distinction, I don't think you should be too troubled about saying, you know what, it is different to have content that tells patients that their health care provider is in violation of the law. And at that point we- It didn't say violation of the law. It said violation of the labor law. So then the inference is that they're not treating their workers fairly. How is that different than the Grinch sticker? I think because a resident is not going to look at that and know what the implications are. They're not going to know what the consequences are for a violation of federal labor law, whether that's the kind of thing that might affect the way they continue to get care or not get care at their facility. So I think it's charging residents with an awful lot of knowledge to expect them to look at it and say, oh, never mind, I'm not concerned because they were only busted for a violation of labor law, and labor law is just something different that should never concern me. So I think the real difference is, you know, this connotation without any context of a legal violation. That, to me, is something that is categorically different from the other kinds of messages. And if you want to have that one area of, you know, if insignia raises that concern, then we are going to look more closely at it. I don't think that's an unreasonable amount of discretion to give health care facilities. So they can say our employer is treating us unfairly, but they can't say a judge or a board has found that our employer is treating us unfairly and that violates the law. Once again, I think it's all about the message. Well, can they say the second thing? I mean, it depends how they say it. They say it just the way I said it. If they had a sticker that said simply, there has been a labor law violation here. No, answer my question. The sticker says the employer treats us unfairly and the judge found that they violated labor law. I think it would still be within the discretion of a health care facility to determine that that was the kind of thing that was disruptive. And if the board wants to question that judgment, it needs to put on its own evidence of its own witnesses, its own experts, its own health care specialists who say that is something that will not reasonably disrupt or disturb patients. Also, you're way too young to put yourself in the place of a 90-year-old, and so is Judge Wilkins. I'm not. But if I saw this and my eyesight were poor and I saw that judge's gavel, that's what I would see. I would see busted in red and I would see the judge's gavel. Do you even know? Does the NLRB use a gavel? I doubt it. I do not know that they do, and I certainly share the same intuition that many of these residents wouldn't see the words that were on this at all and that that is another reason why it's this particular sticker and the way that it was, the characteristics of it that made it different from anything else here. Unless the court has any questions about the flyer issue, I'm happy to. All right. Thank you. We'll give you a couple minutes. Mr. Cantor? Oh, I'm sorry. Go ahead. I'm sorry, Your Honor. May it please the Court, Jared Cantor on behalf of the National Labor Relations Board, and I want to make a point just in case it doesn't disappear that there were two findings with regards to the sticker. There is the selective ban in patient care areas, but there was the global ban at the other two centers as well, and it's our position that That raises a question because the ALJ said that it was stipulated that the respondent permitted his employees to wear all the pins and stickers above at all material times and in all places in the facility for each of the health care centers, and then he separates out two of the six for banning it throughout the center when other stickers were allowed. And why did he do that when the other four, according to the stipulation, also banned it? Well, they didn't, did they? They only banned it in the patient care. So the stipulation is, I think, incorrect. Your Honor, I'd have to pull it up and look at it. It's my understanding that the stipulation from the No, do you have the ALJ's order? Yes, Your Honor. I do have the decision order. It's on page 12, right-hand lane, I mean, right-hand line, first full paragraph. Yes, Your Honor, that referred to the testimony that in all of the exhibits introduced as to all the other stickers that had been worn, so that at all six facilities, all the stickers that had been introduced other than the bust had been worn everywhere. Okay, thank you. And that at these two facilities, it seems like the instruction from Lisa Crutchfield was lost in translation and that what was told to the employees at two out of the six was a garbled message, that they just couldn't wear it at all. Right. And so I just want to make clear that there is that finding as well, which the petitioners don't seem to be challenging at this point. Can you speak to the contention by HealthBridge that your evidentiary standard is impossible to satisfy without exposing residents at health care facilities to the very disruption that they're trying to avoid? Well, Your Honor, the board addresses that, in fact, in a footnote and says, you know, Footnote 8. Yes, Your Honor, that it's looking for specific evidence here, and that does make sense because if the board were to have found in their favor, the board decision itself would have to be supported by substantial evidence. And as we saw in the most recent case addressing this issue, the Washington State Nurses Association, the board found that there had been no violation there, and then the Ninth Circuit said, no, that you need substantial evidence to support your finding that special circumstances was met, and the evidence offered by the evidence that the board relied on there was not enough. So are you saying that they should have let these buttons stay on more than six hours in patient areas until, that isn't right, until a patient started crying or yelling or something, or the family member did? No, Your Honor, it's very clear that actual evidence of harm is not needed, but what's clear from this court's decision in Stanford as well, and it cites Brockton, and the board's decisions is that the fact that there ended up being no complaints, there were no problems, undercuts a claim of special circumstances based on subjective beliefs, speculation, and essentially surmise as to what might happen. I take it what the board was saying in Note 8, though, was we need something that's more facility specific. We need something about the types of patients here or their vulnerabilities or past disruptions to which this might be analogized. Is that the position? Yes, Your Honor. That certainly could be one way. You know, the board has the footnotes citing to Baptist Hospital where the people who testified were doctors and an administrator from the actual hospital itself who were familiar with the patients that were actually being treated there, and that one or two of them testified as to incidents in the past that had led to disruptions and why the ban on solicitation and distribution in that case was reasonable. And in other cases where the board has found special circumstances, you know, for instance, another one was where the union distributed carnations with a ribbon around it, and employees were wearing it in the hospital or the facility decided to ban it because their concern was that it was held together by a long pin and that as nurses would interact with patients, they might get stuck by the pin. And the board there from the ALJ agreed that that was a special circumstances, that it was reasonably likely that as patients were handled by caregivers that they could, in fact, be injured. But that seems like you could analogize that to just the kind of evidence that Healthbridge put in here. There's an expert in gerontology or, you know, this kind of care, and the expert knows that there are people with dementia, there are people with, you know, mobility issues who rely very heavily on their care providers and might feel extremely vulnerable. And they just say, well, this kind of, you know, and there are people with impaired eyesight and they can't necessarily discern all the details. There are people with whatever level of sophistication about the government that wouldn't distinguish between a board and a court and labor and, you know, safety or OSHA or whatever standard. So why isn't that kind of expertise enough? Well, Your Honor, I think in a case it might be enough, but the board found here that she was not familiar, she had no interaction with the actual facility, understanding of the patient population at each one of these. And again, it was at four different centers. She was no specialist in psychology or psychiatry. She was an expert in treating older patients. What difference would that make? I mean, are you saying she should know that they were between the ages of 80 and 90 or 70 and 80 or 90 and 100, that they were all bedridden, that they were all dementia, that they, I mean? That sort of testimony might play in, Your Honor. And as the court criticized the board in Washington State Nurses, to just rely on someone at a high level speculating as to what might happen was not. Well, she's a nursing home administrator, or she was at some point in her career. Correct. And if this had happened at a facility where she was the actual administrator for and could testify with specific evidence. And as to Lisa Crutchfield, she's a corporate executive whose business was labor relations. And so she certainly would know labor law. And she was not based at any of these facilities. She's at Elkridge's corporate headquarters. So once again, that was. . . I can see a difference in facilities with hospitals if you're not in intensive care and you're in rehab or something. But I can't see that there's that much difference among nursing homes. Well, Your Honor, that would have been something that they could have put on it, that what each facility. . . And she says as much. I mean, she's the expert. Yes, Your Honor, but each facility could have different population. It's, I don't, it would be speculating to say that maybe at one facility, for whatever reason, there's a lot of people in their 50s or 60s. There was no independent living unit in these hospitals as I read it. These are pure nursing homes, or am I wrong? Your Honor, I'd have to go back and double-check whether these had components or whether these were, in fact, just nursing homes. But there was no testimony, again, from anyone at the facility as to what the actual patient populations were. Was everyone catatonic? Was everyone in very, very good health at a facility? And the fact, again, that there ended up being no complaints, there were no disruptions, the physicians conducted no follow-up if there had been any incidents. I don't know how you can argue that when they took them down immediately. The stickers, Your Honor? Yes, or when they told them to take them off within six hours. Yes, well, Your Honor, I mean, they wore them for a good part of the day, Your Honor, from the beginning shift at 7 or 8 in the morning all the way through, I believe, 3 o'clock. Somewhere 3, 3.30 near the end of, I guess, what would have possibly been the second shift or the first shift. And that's something that the Board and the courts have found before. That undercuts special circumstances is that nothing ended up happening. You don't have to wait for that. The Supreme Court has said that. Correct, Your Honor. But, again, as the cases we cite mention, that does cut against a special circumstance or showing when all that there is is speculation as to these parade of horribles, and then there is no horribles. Nothing ends up happening. And, again, the Board found that based on the witnesses here, that's all it could do. And whether it had Washington State nurses on its mind that it would be opening itself up to a challenge, just deciding on this rather thin evidence, because, again, the Board's decision, if it had gone the other way, would also need to be supported by substantial evidence. And as the case is made clear, specific evidence had to be put on by the petitioners, and the Board did not find that did based on its two witnesses. What, if any, response do you have to the argument made by petitioners that this was not waived because they did effectively raise the point before the Board? With regards to St. John's changing the law, Your Honor? Yes. As the Board points out in its brief, we argue that that is, in fact, ten-eed. As many decisions from this Court make clear, including the one that strikes to mind is Pace University, a party has to accept, in raising their exceptions, the point that they are challenging, and that even though there's a Board, even though the Board ends up discussing an issue, as happened here between the majority and the dissenting member, Pace University citing a long line of D.C. Circuit cases makes clear that that's not enough for ten-eed, that ten-eed is very specific and that the obligation was on them. And as we note in our brief, it's not only not in their exceptions, but their brief to the Board cites St. John's and presents their case as if St. John's was the governing decision, that there was nothing in their brief even saying we're proceeding under protest that St. John's is the governing law. And so I think that sheds light on the Board's position that when you look at their exceptions, that there was nothing there, and then obviously in their exceptions brief, St. John's is cited repeatedly, and they make the position that they satisfy special circumstances. If there are no further questions, the Board respectfully requests that its order be enforced in full, and we rest on our brief. I have one. Oh, sorry, Your Honor. It's off the record, but do you know whether your Board uses a gavel? Your Honor, I have never sat in on a Board board hearing. I don't believe the administrative law judges use a gavel. Okay, that's a better question. Thank you. All right, does Ms. Murphy have any time? Okay, why don't you take a couple minutes? Thank you, and I only want to make a couple of quick points. First of all, Baptist Hospital, there wasn't evidence of specific actual disruption. The evidence was just like this. It was hospital, health care facility, health care providers who testified. Based on our experience in general, we're concerned about disruption that might occur. It was no different than this testimony, as dissent on the Board pointed out. The Board also raises this notion of, well, here it cuts against us that there wasn't disruption. The cases in which it cut against the hospital that there wasn't disruption, it was a sticker there or a button or whatever it was that was worn for several months, in one case a full year, I believe, without incident. Sure, in that circumstance, you might have a reason to say, hey, this actually was worn and didn't present a problem. Here, we're talking about a matter of hours, and it's not even clear if or how often it was worn at these facilities. So I don't think that there's really much to take from that. The final thing I'd say is I appreciate that the Board is feeling in a difficult position because of the Washington State case where it essentially got itself reversed by deferring to a hospital. But for one thing, I think that there's distinctions between the insignia in the Washington State case and this one. And the other thing I would just note is Washington State is not a precedent of this Court, and it is not consistent with the precedents of this Court to the extent it does seem to have some language that suggests that anything forward-looking is inherently speculative and must be dismissed. This Court has specifically considered that question and specifically rejected, both in the Brockton Hospital case and in the Stanford Hospital case, the notion that you have to wait for actual disruption to occur before you can try and prevent it. If there are no questions, we would ask that you do not enforce the Board's order. All right. Thank you. Thank you.
judges: Henderson, Pillard, Wilkins